Present:  All the Justices

DENNIS MITCHELL ORBE

v.    Record Nos. 990363 & 990364      OPINION BY
                                 JUSTICE CYNTHIA D. KINSER
COMMONWEALTH OF VIRGINIA          September 17, 1999

FROM THE CIRCUIT COURT OF YORK COUNTY
N. Prentis Smiley, Jr., Judge


A jury convicted the defendant, Dennis Mitchell Orbe,
of four charges in connection with a murder during the
commission of robbery.  Those convictions are: (1) capital
murder, in violation of Code § 18.2-31(4); (2) use or
display of a firearm while committing murder, in violation
of Code § 18.2-53.1; (3) robbery, in violation of Code
§ 18.2-58; and (4) use or display of a firearm while
committing robbery, in violation of Code § 18.2-53.1.

At the conclusion of the sentencing phase of a
bifurcated trial, the jury fixed the defendant's punishment
at death for the capital murder, 50 years for the robbery,
and 5 years for each of the firearms offenses.  The jury
imposed the sentence of death based on its finding of
future dangerousness under Code §§ 19.2-264.2 and -264.4.
After reviewing the post-sentence report required by Code
§ 19.2-264.5, the trial court sentenced the defendant in
accordance with the jury verdicts.

The defendant appealed his non-capital convictions to the Court of Appeals pursuant to Code § 17.1-406.[1]  We certified that appeal (Record No. 990364) to this Court under the provisions of Code § 17.1-409 for consolidation with the defendant's appeal of his capital murder conviction (Record No. 990363) and the sentence review mandated by Code § 17.1-313.

On appeal, the defendant challenges the trial court's refusal to instruct the jury on lesser included offenses, the finding of future dangerousness based on consideration of unadjudicated criminal acts, the admission of photographic evidence, and the court's refusal to allow the defendant to mail a questionnaire to prospective jurors. After considering each of these arguments and conducting our statutory review pursuant to Code § 17.1-313, we find no error in the defendant's convictions and sentence of death.  Thus, we will affirm the judgments of the circuit court.

I.  FACTS

A. GUILT PHASE

---

[1]  Title 17.1 became effective on October 1, 1998, replacing Title 17.  Although the parties briefed and argued this appeal under the provisions of Title 17, we will cite Title 17.1 in this opinion since the relevant provisions remain unchanged.

The criminal offenses for which the defendant was convicted occurred at a gas station and convenience store located in York County. The convenience store was equipped with a video camera recording system that monitored three areas of the premises, including the check-out counter and cash register. The camera focused on the cash register captured the incident that is pertinent to this appeal and recorded it on a video tape. That tape reveals the following sequence of events.[2]

Near 3:38 a.m. on January 24, 1998, the defendant entered the convenience store, walked up to the check-out counter where Richard Sterling Burnett was working as a clerk, and pointed a revolver at Burnett's chest.[3] After Burnett opened the cash register drawer, the defendant shot him in the chest. As Burnett was clutching his chest and struggling to remain in a standing position, the defendant walked around the counter, reached into the cash register

---

[2] At trial, the Commonwealth introduced the video tape recording into evidence and played it for the jury.

[3] The defendant had been in the store on two occasions on January 23 but had purchased nothing.

3

drawer, and removed some money from it.[4]  He then fled from the store.

A short while later, a customer at the convenience store discovered Burnett's body and called for emergency assistance.  F.T. Lyons, an investigator with the York County Sheriff's Office, arrived on the scene about 4:25 a.m.  Investigator Lyons found Burnett's body "on the floor . . . behind the register."  He collected several items from the store for evidentiary purposes, including the video tape recording.  He took the video tape to the sheriff's office where he used computer equipment to view it "frame by frame."  Lyons captured images from the video tape, digitized and saved them, and then printed several of the images.  He distributed those printed images to area law enforcement agencies and the media.

The sheriff's office subsequently received several telephone calls from persons who identified the defendant as the individual in the pictures that Lyons had distributed.  Investigator Lyons then obtained warrants

---

[4] According to a territorial manager for the gas station and convenience store, the sum of $90.65 was missing from the cash register drawer.

charging the defendant with capital murder, robbery, and use of a firearm in the commission of murder.[5]

The defendant was not apprehended, however, until January 31, 1998, after a high-speed chase through the streets of Richmond. During the police officers' pursuit, the defendant drove his car across a concrete median strip and struck a telephone pole, then proceeded to drive on the wrong side of the road, and accelerated through a roadblock. Eventually, the defendant jumped out of his vehicle and ran on foot until police officers captured him at the end of an alley.

After placing the defendant under arrest, a police officer searched the defendant's person. During the search, the officer found a partially loaded .357 magnum revolver in the waistband of the defendant's pants.[6] Investigator Lyons eventually took possession of the weapon recovered from the defendant and submitted it to the

---

[5] In addition to these three charges, a grand jury subsequently indicted the defendant for use of a firearm during the commission of robbery.

[6] Willis L. Branch, Jr., the defendant's stepfather, testified that, sometime during the first or second week of January, he discovered that his .357 magnum revolver was missing from the home that Branch shared with the defendant and his mother. At trial, Branch identified the revolver recovered from the defendant as having the same serial number as the one that was missing from his home.

Commonwealth of Virginia Department of Criminal Justice Services, Division of Forensic Science, for testing.

Scott A. Glass, a forensic scientist who works in the field of firearm and tool mark identification at the Division of Forensic Science, tested the revolver along with a "lead semi-wadcutter"[7] bullet that had been removed from Burnett's chest during an autopsy. Based on the results of his analysis, Glass concluded that the bullet had been fired from the .357 magnum revolver.

Dr. Elizabeth Kinnison, a pathologist and an Assistant Chief Medical Examiner for the Commonwealth of Virginia, performed the autopsy on Burnett's body. During the autopsy, Dr. Kinnison recovered the bullet from the right side of Burnett's back where it was lodged. According to Dr. Kinnison, Burnett had "sustained one gunshot wound to the front of the left chest[,]" which was the cause of death. Dr. Kinnison stated that Burnett died "[p]rimarily from hemorrhage or bleeding from these wounds" and that "[t]he structures that were injured that were vital were the heart and the liver and the lung, which all would have caused internal bleeding." She further testified that a person sustaining this type of injury "[m]ight have been in

_____

[7] Branch testified that he kept ".357 magnum, 158 grains semi-wadcutters" as ammunition for his revolver.

some pain associated with the skin[,]" would have suffered increasing problems with breathing as blood was lost, and would have become dizzy and eventually unconscious before dying.

## B. SENTENCING PHASE

During the sentencing phase of the trial, the Commonwealth presented evidence to prove the defendant's future dangerousness. The evidence concerned other criminal acts that the defendant had committed in three separate incidents.

The first incident occurred on January 21, 1998. Lois Jones testified that when she and her boyfriend, Mark Scougal, returned home, Scougal discovered the defendant in a bedroom. The defendant pointed a gun at Scougal and ordered Scougal to drive him "somewhere else" because he was hiding from the police. As the defendant was forcing Scougal to a car, Jones retrieved a gun from her gun cabinet, loaded it, and went out onto the front porch of her house in order to stop the defendant. Although there was conflicting testimony about whether Jones then fired her gun up into the air, the defendant shot at Jones twice. His second shot hit Jones in the calf of her leg and shattered the bone. The defendant then demanded that

7

cougal give him the car keys, but when Scougal refused to comply, the defendant fled from the scene.

The second episode, also on January 21, 1998, involved Charles Powell and William Bottoms, two elderly gentlemen. While Powell and Bottoms were sitting in the front yard of Bottoms' Richmond home, the defendant approached the two men and ordered them to walk to the rear of the house. The defendant displayed a weapon to the men and stated that he "[had] nothing to lose." After questioning both men about the location of their cars, keys, and wallets, the defendant took Powell's car and left in it.

Karen Glenn and Patricia Tuck testified about the third incident, which occurred on January 30, 1998. After Glenn, Tuck, and another woman arrived at a private residence in New Kent County to perform cleaning services, the defendant, who was already inside the house, approached the women, brandished a handgun, and yelled, "Bitches, get down." As they were starting to "get down," the defendant hit Tuck between her shoulder blades with the gun. He then ordered the three women to crawl on their stomachs to a bedroom. Once the women were in the bedroom, the defendant made them go into a closet. He then nailed a piece of plywood across the closet door. The women were trapped inside the closet for approximately four and one-half

8

hours, until the homeowner returned and found them.  During

this ordeal, the defendant proclaimed, "I'm Dennis Orbe,

I'm wanted for murder, and it doesn't matter what I do."

He also directed the women to empty their pockets and took

money, checks, and other valuables, including the keys to

Glenn's car, from them.  He stole the car.

In accordance with Code § 19.2-264.4(B), the jury also

heard evidence "in mitigation of the offense."  The

defendant's mother and step-father testified about the

defendant's troubled childhood and his problems with

alcohol abuse.  One of his friends described a change in

the defendant's behavior shortly before the incidents in

January 1998, and the administrator of a regional jail,

where the defendant had been incarcerated, testified that

he had received only one minor complaint with regard to the

defendant's behavior during his confinement.

The defendant also presented testimony from Dr. Thomas

A. Pasquale, a clinical psychologist who had evaluated the

defendant for purposes of mitigation and risk assessment

regarding the defendant's future dangerousness.  Dr.

Pasquale testified that the defendant had exhibited

suicidal intentions at least a year prior to the events

that transpired in January 1998 and that the defendant was

depressed, in part, over his perceived failure as a father

and husband.  Dr. Pasquale further reported that the defendant drank heavily and had an impulse control dysfunction.

During his evaluation, Dr. Pasquale learned that the defendant's father had abandoned the defendant at an early age.  Consequently, Dr. Pasquale opined that the defendant, who had recently located his father, might have wished to visit his father again and that he had decided to obtain money illegally to accomplish that purpose.  According to Dr. Pasquale, the defendant thus "reasoned his way to intrude into a number of individuals' lives by way of robbery, home invasion, weapons discharge[,] . . . brandishing and general intimidation."

In conclusion, Dr. Pasquale testified that he did not perceive the defendant as being a future danger in a prison setting unless he was able to access alcohol inside the prison, was abused by those within the prison system, or was placed under conditions of duress while incarcerated.  However, Dr. Pasquale stated that, if the defendant escaped from a penitentiary, it would be a "very dangerous, very risky" situation.

## II. ANALYSIS

### A. INSTRUCTIONS ON LESSER INCLUDED OFFENSES

In his first argument,[8] the defendant asserts that his death sentence was imposed under the influence of passion, prejudice, or other arbitrary factors. Specifically, he contends that the circuit court erred in refusing to grant an instruction on first degree murder and an instruction on determining the grade of the offense of homicide.[9] The defendant makes the same argument on appeal but also asserts that the instructions should have been given to the jury because the question whether the defendant acted

---

[8] The defendant's first argument encompasses numbers 1, 10, and 11 of his assignments of error. All references to the defendant's assignments of error are to those that he originally filed rather than to the assignments of error as the defendant renumbered them in his brief.

Although the defendant filed 17 assignments of error in this Court, he argued on brief only 10 of them. The assignments of error that he did not argue, and that we will therefore not consider, are numbers 6, 8, 9, 12, 15, 16, and 17. See Quesinberry v. Commonwealth, 241 Va. 364, 370, 402 S.E.2d 218, 222, cert. denied, 502 U.S. 834 (1991)(holding assignments of error not argued on brief are waived for purposes of appeal).

[9] Although the defendant stated at trial that he was not requesting an instruction on second degree murder, one of his proffered instructions included not only the elements of first degree murder but also those of second degree murder and voluntary manslaughter. His other instruction advised the jury that, if a reasonable doubt exists as to the grade of the offense, the jury must resolve that doubt in favor of the defendant.

maliciously was disputed.[10]  We do not agree with the defendant's argument.

It is well-established in Virginia that jury instructions "are proper only if supported by the evidence, and that more than a scintilla of evidence is necessary to support a lesser-included offense instruction requested by the defendant."  Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998).  We have also recognized that "evidence showing a murder 'to have been deliberate, premeditated and wilful could be so clear and uncontroverted that a trial court could properly refuse to instruct on the lesser included offenses.'"  Buchanan v. Commonwealth, 238 Va. 389, 409, 384 S.E.2d 757, 769 (1989), cert. denied, 493 U.S. 1063 (1990)(quoting Painter v. Commonwealth, 210 Va. 360, 366, 171 S.E.2d 166, 171 (1969)).

---

[10] During oral argument, the defendant posited that the testimony elicited from Scott Glass, the forensic expert, during cross-examination supported the defendant's contention that the shooting of Burnett was "accidental." Glass acknowledged that the weapon used to kill Burnett was a double-action revolver, meaning that the amount of "trigger pull" (the force necessary to work the firing mechanism or cause the hammer to fall) required to fire the gun is less when the hammer is cocked than when the hammer is not in that position.  But, Glass also testified that the gun was equipped with a safety mechanism called a "hammer block rebound system," which means that, even when the hammer is cocked, "the trigger has to be pulled and

12

The evidence in the present case does not support the defendant's proffered instructions. An instruction on first degree murder was not warranted because the video tape clearly established that Burnett was shot in the chest during the commission of armed robbery at the convenience store. See Bennett v. Commonwealth, 236 Va. 448, 470, 374 S.E.2d 303, 317 (1988), cert. denied, 490 U.S. 1028 (1989) (holding first degree murder instruction not warranted because defendant adduced no evidence that victim was not murdered during commission of robbery). Thus, the sole issue was whether the defendant was the person who killed Burnett, i.e., was he "guilty or innocent of the capital offense." Frye v. Commonwealth, 231 Va. 370, 389, 345 S.E.2d 267, 281 (1986). Also, the record does not contain a scintilla of evidence that the defendant acted without premeditation or malice so as to justify an instruction on second degree murder or voluntary manslaughter, respectively. See Donkor, 256 Va. at 445, 507 S.E.2d at 76. Accordingly, we find no error in the circuit court's judgment refusing to grant these two instructions.

### B. FUTURE DANGEROUSNESS BASED ON UNADJUDICATED CRIMINAL ACTS

---

held in the most rearward position" in order for the gun to fire.

13

Next, the defendant challenges the imposition of the death penalty based on the finding that "he would commit criminal acts of violence that would constitute a continuing serious threat to society" pursuant to Code § 19.2-264.4(C).  The defendant's attack with regard to this issue is threefold.  He first asserts that the evidence was insufficient as a matter of law to establish future dangerousness because he "had no prior history of significant violent offenses."  He next contends that the trial court applied an incorrect legal standard in determining future dangerousness.  Finally, he argues that the introduction into evidence of unadjudicated criminal acts violates the Constitution of the United States and the Constitution of Virginia because there is no requirement that such acts be proven beyond a reasonable doubt.[11]  We do not agree with any of the defendant's arguments.

As to the first prong of the defendant's attack, we find sufficient evidence of future dangerousness to support the imposition of the death penalty.  During the month of January 1998, the defendant committed numerous criminal acts in three separate episodes, in addition to the robbery and murder of Burnett.  On January 21, he entered Jones'

---

[11] These three arguments cover numbers 2, 3, 13, and 14 of the defendant's assignments of error.

14

home while no one was present and then shot Jones in the leg when she attempted to stop the defendant's abduction of Scougal. That same day, the defendant used a firearm to rob Powell. Then on January 30, the day before the defendant was apprehended, he abducted and robbed three women, again using a firearm, and left them in a small closet after nailing the door shut. This evidence establishes beyond a reasonable doubt "a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.2; see also § 19.2-264.4(C). Thus, the trial court did not err in refusing to strike the Commonwealth's evidence with regard to the defendant's future dangerousness.

The defendant's next argument is that the trial court adopted the wrong legal standard when it used the phrase "sufficient probable cause" in the following statement, which the court made while overruling the defendant's motion to strike the Commonwealth's evidence at sentencing: "The matter of future dangerousness, again, the evidence — there is evidence before the Court and before this jury and the jury will make the determination as to whether there is sufficient probable cause — probability that the Defendant

15

is guilty of any future dangerousness."  We do not agree with the defendant's contention for two reasons.

First, we believe that the court's use of that phrase was a misstatement because the court immediately corrected itself by using the term "probability."  The term "probability" is part of the criteria set forth in Code § 19.2-264.4(C) for determining future dangerousness: "The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant . . . that he would commit criminal acts of violence that would constitute a continuing serious threat to society."  (Emphasis added.) See also Code § 19.2-264.2.  Furthermore, the court properly instructed the jury in accordance with this statutory provision.  Thus, we conclude that the trial court decided the motion to strike on the issue of future dangerousness under the appropriate standard.

We also find no merit in the third aspect of the defendant's argument regarding future dangerousness.  The defendant asserts that the Commonwealth used unadjudicated criminal acts that had not been proven beyond a reasonable doubt to establish future dangerousness.  However, most of the criminal acts about which the jury heard evidence had

16

been adjudicated. The record shows that, before the sentencing hearing in this case, the defendant had been found guilty, based on his guilty pleas, of the offenses that he committed on January 21 in the City of Richmond and those that he committed on January 30 in New Kent County.

As to those criminal acts that were unadjudicated on the date of the sentencing hearing in the present case, we have previously construed Code § 19.2-264.4(C) "to permit the admission into evidence of unadjudicated misconduct." Spencer v. Commonwealth, 238 Va. 295, 317, 384 S.E.2d 785, 799 (1989), cert. denied, 493 U.S. 1093 (1990). Moreover, we specifically held in Walker v. Commonwealth, 258 Va. 54, 66, 515 S.E.2d 565, 572 (1999), that evidence of each unadjudicated criminal act admitted to show a defendant's future dangerousness is not subject to the reasonable doubt standard. Rather, the finding of future dangerousness must be supported by proof beyond a reasonable doubt. Id. The defendant has offered no reason why we should depart from these precedents. Accordingly, we will not disturb the circuit court's judgment on this issue.

C. ADMISSION INTO EVIDENCE OF PHOTOGRAPHS OF VICTIM

The defendant contends that the circuit court erred in overruling a pretrial motion in limine to exclude photographs of the victim, including autopsy photographs,

17

from being introduced into evidence at trial.[12]  The defendant argues that, since he had stipulated that Burnett was killed by a single gunshot wound to the chest, the Commonwealth offered the photographs solely to arouse the sympathy of the jury for the victim and to prejudice it against him.

Over the defendant's objections, the trial court admitted into evidence photographs exhibiting the following images: (1) the open cash register drawer and the victim slumped on the floor behind the check-out counter; (2) a closer view of Burnett's body sitting on the floor; (3) a small bruise on Burnett's back where Dr. Kinnison found the bullet; (4) the entry wound in Burnett's chest; (5) the victim's condition upon arrival for the autopsy and his blood-stained shirt; (6) Burnett with some of his friends; and (7) Burnett sitting at a sound booth in his church. These photographs accurately depict the crime scene and the victim, and are therefore not rendered inadmissible simply because they may be gruesome or shocking.  Walker, 258 Va. at 69, 515 S.E.2d at 574 (citing Walton v. Commonwealth, 256 Va. 85, 92, 501 S.E.2d 134, 138, cert. denied, ___ U.S. ___, 119 S.Ct. 602 (1998)).  The photographs are relevant

_____

[12] This argument addresses numbers four and seven of the defendant's assignments of error.

to show "motive, intent, method, malice, premeditation and the atrociousness of [the defendant's] crimes." Chichester v. Commonwealth, 248 Va. 311, 326, 448 S.E.2d 638, 648 (1994), cert. denied, 513 U.S. 1166 (1995)(quoting Spencer, 238 Va. at 312, 384 S.E.2d at 796). Any prejudice to the defendant resulting from the admission of the photographs is outweighed by the photographs' probative value. See Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986) (holding probative value of evidence must be balanced against any prejudicial effect). On appeal, we will not disturb a trial court's exercise of discretion in balancing those competing considerations absent a clear abuse of discretion. Id.

Furthermore, the defendant's stipulation with regard to the cause of Burnett's death does not preempt the introduction of the photographs into evidence. See Mackall v. Commonwealth, 236 Va. 240, 253, 372 S.E.2d 759, 767-68 (1988), cert. denied, 492 U.S. 925 (1989) (holding autopsy photograph of victim was admissible even if defendant stipulated identity of victim). Thus, we conclude that the trial court did not abuse its discretion in admitting the photographs. See Clagett v. Commonwealth, 252 Va. 79, 87, 472 S.E.2d 263, 268 (1996), cert. denied, 519 U.S. 1122 (1997) ("The admission into evidence of photographs of the

body of a murder victim is left to the sound discretion of the trial court and will be disturbed only upon a showing of a clear abuse of discretion.").

D. INDIVIDUAL VOIR DIRE AND JUROR QUESTIONNAIRES

Finally, in assignment of error number five, the defendant claims that he was prejudiced by the court's refusal to permit him to mail a questionnaire to each prospective juror. On brief, the defendant also argues that he was denied a full and fair opportunity to examine the venire because the circuit court did not allow him to conduct individual voir dire. The defendant did not include the issue regarding individual voir dire in an assignment of error. Therefore, we will not consider it. Rule 5:17(c). As to the issue properly preserved, we find no error in the circuit court's judgment.

The manner in which voir dire is conducted lies within the trial court's discretion, and its decisions concerning voir dire will not be disturbed absent an abuse of discretion. Fisher v. Commonwealth, 236 Va. 403, 410-11, 374 S.E.2d 46, 50 (1988), cert. denied, 490 U.S. 1028 (1989). We have previously decided that a trial court did not abuse its discretion by refusing to allow a defendant to send a questionnaire to prospective jurors. Hedrick v. Commonwealth, 257 Va. 328, 337, 513 S.E.2d 634, 639 (1999);

20

Strickler v. Commonwealth, 241 Va. 482, 489-90, 404 S.E.2d 227, 232, cert. denied, 502 U.S. 944 (1991). Such a practice "would detract from the trial judge's 'opportunity . . . to observe and evaluate . . . prospective jurors first hand.'" Id. at 490, 404 S.E.2d at 232 (quoting Pope v. Commonwealth, 234 Va. 114, 124, 360 S.E.2d 352, 358 (1987), cert. denied, 485 U.S. 1015 (1988)). "[T]he opportunity to see and hear the veniremen, when questioned during voir dire, is crucial to the effective discharge of the trial judge's responsibility." Strickler, 241 Va. at 490, 404 S.E.2d at 232. Thus, we conclude that the circuit court did not abuse its discretion.[13]

III. PASSION, PREJUDICE, AND PROPORTIONALITY REVIEW

---

[13] After the time limit for filing assignments of error had expired, the defendant filed a motion in this Court for leave to file an additional assignment of error in this appeal. In the new assignment of error, he asserted that the trial court gave the jury a verdict form that was inconsistent with the penalty phase jury instructions. The defendant based his motion on the recent decision of this Court in Atkins v. Commonwealth, 257 Va. 160, 510 S.E.2d 445 (1999). This Court denied the defendant's motion on May 10, 1999. Nevertheless, he argued, both on brief and orally, this issue concerning the verdict form. Because the defendant failed to preserve an objection to the verdict form at trial, the defendant is procedurally barred from raising the issue on appeal. Rule 5:17(c). Furthermore, we specifically denied his motion to file an additional assignment of error. Although we rely on the defendant's procedural default to resolve this issue, we note that the verdict form in this case did not have the problem addressed in Atkins.

21

Pursuant to Code § 17.1-313(C)(1), we must determine whether the death sentence in this case was imposed under the influence of passion, prejudice, or other arbitrary factors. Upon careful review of the record, we find no evidence that any such factor was present or influenced either the jury's or the trial court's sentencing decision. The defendant's only contention with regard to this issue is that the sentence of death was imposed under the influence of prejudice because the trial court did not instruct the jury on lesser included offenses. We have already addressed that question.

Code § 17.1-313(C)(2) requires us to determine whether the sentence of death in this case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Pursuant to Code § 17.1-313(E), we have accumulated the records of all capital murder cases reviewed by this Court. The records include not only those capital murder cases in which the death penalty was imposed, but also those cases in which the trial court or jury imposed a life sentence and the defendant petitioned this Court for an appeal. Whitley v. Commonwealth, 223 Va. 66, 82, 286 S.E.2d 162, 171, cert. denied, 459 U.S. 882 (1982).

In complying with the statutory directive to compare this case with "similar cases," we have specifically focused on cases in which an employee was murdered at a business establishment during the commission of robbery and the death penalty was imposed solely on the future dangerousness predicate. [14] See, e.g. Peterson v. Commonwealth, 225 Va. 289, 302 S.E.2d 520, cert. denied, 464 U.S. 865, reh'g denied, 464 U.S. 1004 (1983)(accountant murdered during armed robbery of store; defendant had prior convictions for armed robbery, two of which occurred within three weeks of the capital murder); Townes v. Commonwealth, 234 Va. 307, 362 S.E.2d 650 (1987), cert. denied, 485 U.S. 971 (1988)(female employee murdered during robbery of store; defendant had 22 prior convictions for forgery and uttering, 4 convictions for robbery, and convictions for maiming, felony escape, and use of a firearm); Mackall, 236 Va. 240, 372 S.E.2d 759 (gas station cashier killed during

---

[14] This Court compiled a list of cases involving capital murder during the commission of robbery and a finding of future dangerousness in Yeatts v. Commonwealth, 242 Va. 121, 143, 410 S.E.2d 254, 267-68 (1991), cert. denied, 503 U.S. 946 (1992). We supplemented that compilation in Chichester, 248 Va. at 332-33, 448 S.E.2d at 652; and in Roach v. Commonwealth, 251 Va. 324, 351, 468 S.E.2d 98, 113, cert. denied, 519 U.S. 951 (1996). Since the last supplementation, we have decided Jackson v. Commonwealth, 255 Va. 625, 499 S.E.2d 538 (1998), cert. denied, __ U.S. __, 119 S.Ct. 796 (1999); and Walton, 256 Va. 85, 501 S.E.2d 134.

23

armed robbery; defendant's criminal history included larcenies, burglaries, threats of violence to correctional officers, and possession of deadly weapon while incarcerated); Dubois v. Commonwealth, 246 Va. 260, 435 S.E.2d 636 (1993), cert. denied, 511 U.S. 1012 (1994)(store employee murdered during armed robbery; defendant previously convicted of grand larceny, assault, and possession of firearm as a convicted felon); Chichester, 248 Va. 311, 448 S.E.2d 638 (employee killed during armed robbery of restaurant; defendant previously convicted of carrying concealed weapon; and nine days before capital murder offense, defendant robbed another restaurant); Joseph v. Commonwealth, 249 Va. 78, 452 S.E.2d 862, cert. denied, 516 U.S. 876 (1995) (employee murdered during armed robbery of restaurant; defendant had assaulted police officer, had been in possession of loaded revolver and crack cocaine, and had participated in abduction of two store clerks during armed robbery). We have also reviewed cases in which the defendant received a life sentence, rather than the death penalty, for capital murder during the commission of robbery. See, e.g. Johnson v. Commonwealth, 221 Va. 736, 273 S.E.2d 784, cert. denied, 454 U.S. 920 (1981); Bowling v. Commonwealth, 12 Va. App. 166, 403 S.E.2d 375 (1991); Wilkins v. Commonwealth, appeal

denied, No. 840142 (Va. Oct. 10, 1984); Freeman v. Commonwealth, appeal denied, No. 830290 (Va. Jan. 25, 1984).

The purpose of our comparative review is to reach a reasoned judgment regarding what cases justify the imposition of the death penalty.  We cannot insure complete symmetry among all death penalty cases, but our review does enable us to identify and invalidate a death sentence that is "excessive or disproportionate to the penalty imposed in similar cases."  Code § 17.1-313(C)(2); see Tennessee v. Bland, 958 S.W.2d 651, 665 (Tenn. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1536 (1998)(The court's "function in performing comparative review is not to search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and invalidate the aberrant death sentence.").  The defendant has not argued that the sentence of death in his case is disproportionate, and based on our review of this case and "similar cases," we conclude that the defendant's sentence of death is not excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to the defendant's murder of Burnett.

For these reasons, we find no error either in the judgments of the circuit court or in the imposition of the

death penalty.  Therefore, we will affirm the judgments of the circuit court.

Record No. 990363--<u>Affirmed</u>.
Record No. 990364--<u>Affirmed</u>.
