Present:  All the Justices

THOMAS WAYNE AKERS

                                      OPINION BY

v.  Record No. 992894     JUSTICE LAWRENCE L. KOONTZ, JR.

                              September 15, 2000

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
William N. Alexander, II, Judge

Thomas Wayne Akers received a death sentence upon a plea of guilty to a charge of capital murder during the commission of a robbery, Code § 18.2-31(4), in the death of Wesley B. Smith.[1] Although Akers has waived his appeal of right, Code § 17.1-313 mandates that we review the death sentence.  We must consider and determine whether the sentence of death was imposed "under the influence of passion, prejudice or any other arbitrary factor," Code § 17.1-313(C)(1), and whether that sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Code § 17.1-313(C)(2).

BACKGROUND

On the morning of December 19, 1998, responding to a citizen report that a body was located there, Franklin County Sheriff's Department Investigator F.M. Jamison went to a field

at the intersection of State Route 40 and Sawmill Road in Franklin County.  Jamison discovered three pools of blood on the shoulder of the road and "a clear drag mark which was saturated with blood that went down the hill toward a creek."  Following the trail of blood, Jamison discovered Smith's body, which was covered with blood and bore the unmistakable signs of a savage beating including "[s]everal wounds to the back of his head, deep cuts, hair knocked off his head, a lot of blood on his shirt and his coat, and a large pool of blood under his face".  Searching further, Jamison found an aluminum baseball bat "lying in the creek partially submerged" twelve to fifteen feet from Smith's body.  Subsequent laboratory testing established that Smith's blood was on the bat.

Forensic examination of Smith's body revealed that he had been struck a minimum of three times in the head "and probably a great deal more than three" times.  As a result, Smith suffered several fractures to his skull causing a subdural hematoma.  The blows were not instantly fatal, and it would have taken "minutes to hours, at least," before Smith died.  In addition to the lethal wounds inflicted to his head, Smith suffered numerous defensive wounds to his hands and arms.  He also had been struck

---

[1]Akers also pleaded guilty to having robbed Smith, Code § 18.2-58, and was sentenced to life imprisonment for that offense.  Akers has not appealed that judgment.

2

several times on his back, and his neck was bruised in a manner consistent with an attempted strangulation by ligature. The ligature marks were consistent with the size and shape of a belt subsequently discovered in Smith's car.

Franklin County Sheriff's Department Investigator H.T. Woods interviewed Smith's mother, his sister, and George Slusser, a family friend. Based on these interviews, Woods determined that on the evening of December 18, 1998, Slusser had visited Smith at his apartment in Roanoke. At approximately 8:00 p.m., Akers and Timothy Martin, Akers' cousin, arrived at Smith's apartment. Martin and Smith had been acquainted for some time and Martin had recently introduced Smith to Akers. Akers and Martin told Smith that they had set him up for a "blind date." The four men left the apartment and drove in Smith's car a short distance away to drop Slusser off at the home of his girlfriend. Akers, Martin, and Smith were seen together later that evening at a Roanoke nightclub.

After it was discovered that Smith had been murdered, that Smith's apartment had been ransacked, and that several items of value were missing from the apartment, arrest warrants were issued for Akers and Martin for the murder and robbery of Smith, along with a bulletin for law enforcement officers to be on the lookout for Smith's car, which had vanity plates reading "WESMODE." On December 22, 1998, an officer with the St. Regis

3

Mohawk Tribal Police in northern New York observed Smith's car in an area of the Mohawk reservation near the Canadian border known for smuggling activity and illegal alien entry. Upon learning that the vehicle and its occupants were wanted in Virginia, tribal police stopped the car and took Akers and Martin into custody. Akers subsequently attempted to flee from a room at the police station and when he was subdued he told the tribal police officers, "It's a good day to die."

When he was arrested, Akers was in possession of Smith's wallet. A search of Smith's car revealed numerous items from Smith's apartment, the belt used as a ligature, and a pair of black boots covered with Smith's blood. The boots were subsequently identified as belonging to Akers.

Thereafter, Akers talked openly with other prisoners about Smith's murder. Akers stated that he, Martin, and Smith had stopped at the field to urinate. Akers took the belt and placed it around Smith's neck, using it to drag Smith away from the car. Akers then held Smith down on the ground and choked him with the belt. Akers and Martin then took turns beating Smith with the baseball bat, which they had found in Smith's car. Smith resisted and begged the two men to stop. Akers and Martin then dragged Smith to the creek where they beat him again and abandoned him, throwing the baseball bat into the creek.

Akers subsequently admitted to the killing in letters sent to the Commonwealth's Attorney. In one letter, Akers admitted that "[i]t was my full intent to kill and rob Wesley Smith after I got acquainted with him," and that he had taken approximately two hundred dollars from Smith's wallet. In another letter, Akers admitted beating Smith to death before returning to Smith's apartment to have "a decent meal and change into [Smith's] clothes and [take] a pleasurable trip to New York." Akers further stated that he left his boots "all blood covered for the Commonwealth." Akers later told the probation officer preparing his presentence report that he planned to kill Smith because Martin had told him that Smith "was going to get 20 other people to assault Martin."

Prior to the entry of his guilty plea, Akers was evaluated by Evan S. Nelson, Ph.D., a licensed clinical psychologist, and was found competent to enter that plea. At a hearing held on September 28, 1999, the trial court heard evidence in accord with the above-recited facts, and thereafter accepted Akers' guilty plea and ordered that a presentence report be prepared.

Akers had directed his attorneys not to present any evidence on his behalf during the guilty plea hearing or at his sentencing hearing. Following the guilty plea hearing, the trial court instructed Akers' counsel to obtain a further opinion from Dr. Nelson concerning Akers' competence to waive

5

his right to present evidence in mitigation at sentencing. In a letter to Akers' counsel subsequently received into evidence by the trial court at the sentencing hearing, Dr. Nelson opined that "Akers possessed the capacity to rationally understand, appreciate, and consider the consequences of his plea of guilty." Dr. Nelson further opined that while "[i]t makes all parties uncomfortable to see a defendant choose to place himself in the [worst] legal position possible" by waiving his right to present evidence in mitigation, there was "no viable reason to question [Akers'] competency to do so."

Following the preparation of the presentence report, the trial court held a sentencing hearing on November 5, 1999. At that hearing, the Commonwealth, relying on the evidence from the guilty plea hearing, contended that the killing of Smith was vile in that it involved an aggravated battery, torture of the victim, and resulted from depravity of mind. Code § 19.2-264.2. The Commonwealth also contended that Akers represented a continuing threat to society. Id. In support of this latter contention, the Commonwealth presented evidence of Akers' extensive criminal history including four convictions for robbery and seven convictions for larceny. Akers had also been convicted of assaulting correctional officers while in prison and had numerous notations of infractions in his prison record including disciplinary actions for thirty-two assaults. The

Commonwealth offered additional evidence showing that while in jail awaiting trial in this case, Akers repeatedly assaulted jail officers and destroyed and defaced jail property.[2]

Akers told the trial court that he wanted to receive a death sentence.  Akers reiterated to the trial court statements that he had made orally and in letters to the trial court, the police, his counsel, and the Commonwealth's Attorney at various times since his arrest that he would "plot and scheme behind bars and escape and come back to Franklin County" to commit additional murders if he were given a life sentence.  When asked if he had anything to say prior to sentencing, Akers said, "I have no sympathy or remorse for what I did, and I plan to commit another capital murder in the future."  In imposing the death sentence, the trial court found that the aggravating factors of vileness in the commission of the murder and of future dangerousness to society were both present.

Pursuant to Code § 17.1-313(C), we are required to consider "any errors in the trial enumerated by appeal" in any case where a sentence of death is imposed.  Accordingly, the trial court is

---

[2]At the sentencing hearing, Akers' attorneys proffered to the trial court evidence in mitigation that they would have presented had Akers allowed them to do so.  The proffer consisted principally of evidence concerning Akers' "horrible" childhood, prior psychiatric treatment, and testimony of his mother and grandmother.

required to forward the trial record of such case to this Court where an appeal of right will be heard. Code § 17.1-313(A).

After the trial court record was received, Akers notified this Court of "his intent not to participate in [the] appeal" permitted pursuant to Code § 17.1-313. We returned the record to the trial court with instructions that a hearing be held to determine whether Akers' waiver of appeal was voluntarily and intelligently made. On March 16, 2000, the trial court conducted that hearing and determined that Akers voluntarily and intelligently waived his right to participate in the appeal. On April 4, 2000, the trial court entered an order reflecting its findings and returned the record to this Court in order that we might conduct the mandated review of the death sentence.[3]

DISCUSSION

Akers instructed his attorneys to file no brief in support of commuting his death sentence. The review process mandated by Code § 17.1-313(C) cannot be waived. Rather, the purpose of the review process is to assure the fair and proper application of the death penalty statutes in this Commonwealth and to instill

_____

[3]While our consideration of the trial court's judgment is thus limited by Akers' waiver, we note that the evidence adduced by the Commonwealth establishes Akers' guilt beyond any reasonable doubt and that the record adequately supports the trial court's determinations that Akers' guilty plea, his subsequent refusal to participate in his sentencing, and his

8

public confidence in the administration of justice. Accordingly, by order of this Court dated April 21, 2000, we instructed Akers' attorneys to file a brief limited to the issues to be considered under the statutorily mandated review of Akers' death sentence.

Counsels' duty to assist the Court in this process as officers of the Court does not conflict with their concomitant duty to represent the defendant in the manner he desires. Undeniably, these concomitant duties may place counsel in an ethically difficult and, as Akers' counsel noted during oral argument of this appeal, professionally "frustrating" position. The record in this case, however, demonstrates that counsel may, without violating the express directives of the defendant concerning his desired manner of representation, fulfill the obligations owed to the trial court and this Court on appeal. In this manner, both the interests of the defendant, as he determines them, and the interests of justice are served.

Pursuant to Code § 17.1-313(C)(1), we now consider whether the death sentence in this case was imposed "under the influence of passion, prejudice or any other arbitrary factor." The brutality of the crime amply demonstrates the vileness and depravity of mind involved in the murder of Smith. Similarly,

---

waiver of his appeal of right were voluntary, informed decisions

9

Akers' stated lack of remorse and his insistence that he would commit further acts of violence if allowed any modicum of freedom demonstrates Akers' future dangerousness to society. In light of these facts and upon careful review of the whole record, we find no evidence that the trial court's sentencing decision was influenced by passion, prejudice, or any arbitrary factor, but was, in fact, wholly grounded in a reasonable evaluation of the evidence.

Pursuant to Code § 17.1-313(C)(2), we next focus our consideration on whether the sentence of death in this case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." In accordance with Code § 17.1-313(E), we have accumulated the records of all capital murder cases reviewed by this Court. The records include not only those capital murder cases in which the death penalty was imposed, but also those cases in which the trial court or jury imposed a life sentence and the defendant petitioned this Court for an appeal. Whitley v. Commonwealth, 223 Va. 66, 81-82, 286 S.E.2d 162, 171, cert. denied, 459 U.S. 882 (1982).

"The purpose of our comparative review is to reach a reasoned judgment regarding what cases justify the imposition of

on his part.

10

the death penalty. We cannot insure complete symmetry among all death penalty cases, but our review does enable us to identify and invalidate a death sentence that is 'excessive or disproportionate to the penalty imposed in similar cases.' " Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1970 (2000). In complying with the statutory directive to compare this case with similar cases, we have specifically focused on cases analogous to the facts in this record where the predicate offense was robbery and the death sentence was imposed upon a finding by the trial court that both aggravating factors were present. See, e.g., Stout v. Commonwealth, 237 Va. 126, 376 S.E.2d 288, cert. denied, 492 U.S. 925 (1989); Poyner v. Commonwealth, 229 Va. 401, 329 S.E.2d 815, cert. denied, 474 U.S. 865 (1985); Edmonds v. Commonwealth, 229 Va. 303, 329 S.E.2d 807, cert. denied, 474 U.S. 975 (1985). In each instance, the evidence of the vileness of the crime and the defendant's future dangerousness to society is equaled or exceeded by the evidence presented by the Commonwealth on these issues in this case.

Akers presents no argument that the sentence of death in his case is disproportionate, and based on our review of this case and similar cases we conclude that the sentence of death is neither excessive nor disproportionate to sentences generally

11

imposed in this Commonwealth for capital murders comparable to Akers' murder of Smith.

CONCLUSION

Accordingly, we perceive no reason to commute the death sentence in this case and will affirm the judgment of the trial court.

<u>Affirmed</u>.

12