Present:  All the Justices

CHRISTOPHER SCOTT EMMETT

v.  Record No. 020314

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE LAWRENCE L. KOONTZ, JR.
September 13, 2002

FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge


In a bifurcated trial conducted pursuant to Code § 19.2-264.3, a jury convicted Christopher Scott Emmett of the capital murder of John Fenton Langley in the commission of robbery, Code § 18.2-31(4), and fixed Emmett's punishment at death.  The trial court imposed the death sentence in accordance with the jury's verdict.  Code § 17.1-313(A) mandates that we review the imposition of a death sentence.[1]

---

[1] Emmett was also convicted of robbery and sentenced to life imprisonment for that crime.  Emmett noted an appeal of his convictions, but on February 8, 2002 he filed a motion to withdraw that appeal.  Pursuant to the February 22, 2002 order of this Court, the case was returned to the trial court with instructions to determine whether Emmett's decision to waive his appeal was voluntarily and intelligently made.  At a hearing on March 4, 2002, the trial court accepted Emmett's voluntary waiver of his right to appeal, finding that he fully understood the consequences of doing so.  On March 8, 2002, the trial court entered an order to that effect and returned the record to this Court in order that we might conduct the mandated review of Emmett's death sentence.

BACKGROUND

Weldon Roofing Company employed Emmett and Langley as laborers for its roofing crews. During late April 2001, both men were assigned to a project in the City of Danville and shared a room at a local motel where the roofing crew was staying. On the evening of April 26, 2001, Emmett, Langley, Michael Darryl Pittman, and other members of the roofing crew cooked dinner on a grill at the motel, played cards, and drank beer. During the course of the evening, Langley loaned money to Emmett and Pittman, who used the money to buy crack cocaine.

At approximately 11:00 p.m. that evening, Rainey Bell, another member of the roofing crew, heard a noise he described as "bang, bang" coming from the room Emmett and Langley shared. Shortly after midnight, Emmett went to the motel office and asked the clerk to call the police, saying that he had returned to his room, "seen blood and stuff . . . and didn't know what had took place."

The police arrived at the motel at 12:46 a.m. on April 27, 2001 and accompanied Emmett back to his room. There they discovered Langley's dead body lying face down on Langley's bed beneath a comforter. Blood spatters were found on the sheets and headboard of Langley's bed, on the wall behind it, and on the wall between the bathroom and Emmett's bed. A damaged brass

lamp stained with Langley's blood was discovered beneath Langley's bed.

In his initial statement to police, Emmett denied killing Langley. He stated that he had returned to the room and gone to bed. Emmett claimed to have discovered the blood and Langley's body later that night when he got up to use the bathroom. Observing what appeared to be bloodstains on Emmett's personal effects, the police took possession of Emmett's boots and clothing with his permission. Emmett suggested that the blood might be his own because he had injured himself earlier in the week. Subsequent testing, however, revealed that Emmett's boots and clothing were stained with Langley's blood.

Later in the morning of April 27, Emmett voluntarily accompanied the police to the Danville police station. There he agreed to be fingerprinted and gave a sample of his blood. Emmett admitted to the police that he had been drinking and using cocaine on the previous evening. Over the course of the next several hours, Emmett related different versions of the events of the previous evening to the police. He first implicated Pittman as Langley's murderer, but ultimately Emmett told the police that he alone had beaten Langley to death with the brass lamp.

Emmett was given Miranda warnings and he gave a full, taped confession. Emmett stated that he and Pittman decided to rob

Langley after Langley refused to loan them more money to buy additional cocaine.  Emmett stated that he struck Langley five or six times with the brass lamp, took Langley's wallet, and left the motel to buy cocaine.

PROCEEDINGS

Emmett was indicted for capital murder and robbery.  In the guilt-determination phase of a bifurcated jury trial beginning on October 9, 2001, the Commonwealth presented evidence in accord with the above-recited facts.  In addition, the Commonwealth presented evidence from the medical examiner that based upon the amount of blood and bruising of the victim's brain tissue at the point of impact, Langley was not killed immediately by the first blow from the lamp.  The medical examiner conceded, however, that Langley might have been unconscious after the first blow was struck and may have suffered "brain death" prior to actual death.

After the jury convicted Emmett of capital murder and robbery, during the penalty-determination phase of the trial, the Commonwealth presented evidence of Emmett's prior criminal history.  This evidence included an account of an instance in which, while incarcerated in a maximum-security juvenile detention facility, Emmett participated in an escape that involved a guard being "rushed" and locked in a closet.  In addition, the criminal history evidence showed that while

4

driving a vehicle under the influence of alcohol, Emmett was involved in an accident in which the driver of a motorcycle was killed in 1996. After the accident Emmett said "that there was no need to worry about the man on the motorcycle. He was already dead, and that [Emmett] could do nothing to help him." Emmett was convicted of involuntary manslaughter.

The Commonwealth also presented extensive victim-impact testimony from members of Langley's family. Emmett objected to various statements made by the victim-impact witnesses who appeared to urge the imposition of the death penalty. The trial court sustained these objections and directed the jury to disregard the statements.

Emmett presented evidence in mitigation from his mother, sister, and a family friend. Emmett's mother testified that Emmett's father had been abusive, and "he just never took care of his family." Both Emmett's mother and sister testified that Emmett had become withdrawn in the months prior to Langley's murder. The friend described Emmett as "a caring person" who had helped her disabled husband with yard work and had assisted her in caring for her son when he was injured and unable to walk.

The jury returned its verdict imposing the death sentence based upon both the statutory aggravating factors of future dangerousness and vileness. Following consideration of a

presentence report, the trial court imposed the jury's sentence of death.

DISCUSSION

As we have previously noted, Emmett has voluntarily waived his right to appeal his convictions and, thus, to have the proceedings of his trial reviewed for reversible error. The Commonwealth contends that this waiver bars Emmett from asserting that the death sentence was imposed as a result of passion, prejudice, or other arbitrary factors because certain evidence was erroneously admitted or that certain remarks by the Commonwealth's Attorney during the penalty-phase closing argument were improper and should have been stricken from the record.

We agree with the Commonwealth that, having waived his right of appeal, Emmett may not assert that his sentence of death is improper merely on the ground that there may have been reversible errors committed in his trial. We consistently adhere to the contemporaneous objection requirement of our Rule 5:25 and the further requirement of Rule 5:27 that trial error must be the subject of an assignment of error. See, e.g., Overton v. Commonwealth, 260 Va. 599, 604, 539 S.E.2d 421, 423 (2000) (applying Rule 5:25 to failure to object to victim impact testimony or introduction of photographs in Code § 17.1-313(C) review of death sentence); George v. Commonwealth, 242 Va. 264,

6

284, 411 S.E.2d 12, 23-24 (1991), cert. denied, 503 U.S. 973 (1992) (consolidation of charges not the subject of assignment of error not considered in passion and prejudice review); see also Rule 5:17(c).  Emmett's waiver of appeal implicates both of these procedural requirements for our review of potential trial errors, and we decline to create an exception to these requirements.

However, "[t]he review process mandated by Code § 17.1-313(C) cannot be waived.  Rather, the purpose of the review process is to assure the fair and proper application of the death penalty statutes in this Commonwealth and to instill public confidence in the administration of justice."  Akers v. Commonwealth, 260 Va. 358, 364, 535 S.E.2d 674, 677 (2000).

The review process mandated by Code § 17.1-313(C)(1) is meaningless without the recognition that the erroneous admission of some evidence or some other error in an incident of trial might result in a prejudicial verdict.  Indeed, the import of the review mandated by Code § 17.1-313(C)(1) is that a sentence of death may be imposed erroneously as the result of passion, prejudice, or other arbitrary factors even where there is, or could be, no finding of reversible error in the trial proceedings.  Accordingly, in this case, while we will not consider the merits of any assertion that evidence was improperly admitted or that the Commonwealth's Attorney made

7

improper statements, we will nonetheless consider the potential impact such evidence and statements may have had on the jury's decision to impose the death sentence.

Emmett makes several arguments in support of the contention that the sentence of death was imposed upon him as the result of passion, prejudice, or other arbitrary factors.  Chiefly, he points to the emotionally charged testimony of the victim's family members and their statements that appeared to urge the imposition of the death penalty.  However, each time a victim-impact witness's testimony broached this subject, Emmett objected, and the trial court instructed the jury to disregard the witness's statement.  A jury is presumed to follow the instructions of the trial court.  Weeks v. Angelone, 528 U.S. 225, 234 (2000); LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983), cert. denied, 464 U.S. 1063 (1984). Accordingly, we do not believe that this testimony unduly influenced or prejudiced the jury in its determination whether to impose the death sentence.

In further support of his assertion that his death sentence was imposed as a result of passion or prejudice, Emmett points to misstatements by the Commonwealth's Attorney during his closing argument in the penalty-determination phase of the trial to the effect that any one of the blows to the victim could have proven fatal, and a reference to Emmett's prior conduct as

8

having occurred in a prison rather than as in a maximum-security juvenile detention facility. He further contends that the Commonwealth's Attorney intended to inflame the jurors' passions by telling them that "nobody is safe from this guy" and that Emmett is dangerous because "[h]e has nothing to lose."

We agree that the Commonwealth's Attorney mischaracterized the medical examiner's testimony and that he inaccurately referred to the juvenile detention facility as a prison. However, these misstatements were minor and not unduly prejudicial in light of the trial court's instruction to the jury that the argument of counsel was not evidence. Reviewing the Commonwealth's Attorney's argument as a whole, we do not believe that any of the instances cited by Emmett, individually or cumulatively, created an atmosphere of passion or prejudice that influenced the jury's sentencing decision. See Burns v. Commonwealth, 261 Va. 307, 344, 541 S.E.2d 872, 896, cert. denied, ___ U.S. ___, 122 S.Ct. 621 (2001).

Emmett further contends that crime scene and autopsy photographs admitted into evidence were unduly gruesome and would have inflamed the jury's passion in favor of imposing the death sentence. While undoubtedly shocking and gruesome, photographs that accurately depict the crime scene and the condition of the victim are relevant to show motive, intent, method, malice, premeditation, and the atrociousness of the

9

crimes.  Payne v. Commonwealth, 257 Va. 216, 223, 509 S.E.2d 293, 297 (1999).  They also are relevant to show the likelihood of Emmett's future dangerousness.  Id.  Having reviewed these exhibits, we cannot say that they would have unduly prejudiced the jury or improperly inflamed the jurors' passions so as to taint their decision in favor of imposing the death sentence.

Emmett also contends that the admission of his prior inconsistent statements to the police denying responsibility for the murder and attempting to shift the blame to Pittman was unduly prejudicial.  These statements were clearly relevant to show Emmett's consciousness of guilt.  See Rollston v. Commonwealth, 11 Va. App. 535, 548, 399 S.E.2d 823, 831 (1991) ("A defendant's false statements are probative to show he is trying to conceal his guilt, and thus is evidence of his guilt"); see also Carter v. Commonwealth, 223 Va. 528, 532, 290 S.E.2d 865, 867 (1982) (holding that trier-of-fact need not believe a defendant's explanation of events and may infer consciousness of guilt from his false testimony).  There is no indication in the record that the Commonwealth introduced these statements for any improper purpose, and we perceive nothing in the record to support the suggestion that the jury was unduly influenced by this evidence in considering whether to impose the death sentence.

10

Finally, Emmett asserts that the evidence was insufficient for the jury to have found that either aggravating factor necessary under Code § 19.2-264.2 to the imposition of a death sentence was present in this case and, thus, that the sentence of death must have resulted from passion, prejudice, or other arbitrary factors. There is no merit to this assertion.

With regard to the future dangerousness predicate, the Commonwealth introduced evidence of Emmett's prior participation in an escape from a maximum-security juvenile detention facility, which included an assault on a guard, and his subsequent conviction as an adult for involuntary manslaughter. The evidence also showed that Emmett lacked remorse for this earlier violent crime and for the instant killing of a co-worker. Indeed, Emmett himself confessed that he killed Langley simply because it "just seemed right at the time." Such lack of regard for a human life speaks volumes on the issue of future dangerousness and leaves little doubt of its probability.

With regard to the statutory vileness predicate, the Commonwealth's evidence supports two of the alternative circumstances that can support a finding of vileness, i.e., aggravated battery and depravity of mind. See Goins v. Commonwealth, 251 Va. 442, 468, 470 S.E.2d 114, 131, cert. denied, 519 U.S. 887 (1996) (proof of any one of these statutory components will support a finding of vileness). Aggravated

11

battery is "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979). The use of a blunt object to batter the skull of the victim repeatedly and with such force that blood spatters several feet from the victim is clearly both qualitatively and quantitatively more force than the minimum necessary to kill the victim.

Emmett's actions also established depravity of mind, that is, a "degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." Id. The evidence established that Emmett violently attacked a co-worker with whom he had apparently enjoyed an amicable relationship. The brutality of the crime amply demonstrates the depravity of mind involved in the murder of Langley. Cf. Akers, 260 Va. at 364, 535 S.E.2d at 677.

Pursuant to Code § 17.1-313(C)(2) we must also determine whether Emmett's death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Emmett first notes that Code § 17.1-313(E) directs this Court to consider "such records as are available as a guide in determining whether the sentence imposed in the case under review is excessive." He

12

asserts that because records of unappealed capital murder convictions in which a sentence of life imprisonment was imposed are not collected for consideration during our proportionality review, the review is inadequate because the comparison base is skewed in favor of the death penalty.  We have previously rejected this argument and determined that the statute does not require us to collect data from unappealed cases.  Bailey v. Commonwealth, 259 Va. 723, 741-42, 529 S.E.2d 570, 580-81, cert. denied, 531 U.S. 995 (2000).  In Bailey, we held that Code § 17.1-313(E) grants this Court the discretion to determine what records to accumulate for our review process and that, "so long as the methods employed assure that the death sentence is not disproportionate to the penalty generally imposed for comparable crimes, due process will be satisfied and the defendant's constitutional rights protected."  Id.

Emmett further contends that sentencing bodies in the Commonwealth generally have not imposed the death penalty in capital murder cases where the predicate crime was robbery.  In support of this contention, Emmett asserts that a review of the 50 most recent capital murder appeals in this Court would reveal that 17 of the 26 convictions where robbery was the gradation offense resulted in life sentences.  Moreover, he contends that the facts of the cases in which life sentences were imposed are

13

comparable or similar to the facts involved in his own crime or more egregious.

Our proportionality analysis encompasses all capital murder cases presented to this Court for review and is not limited to cases selectively chosen by a defendant. "The test is not whether a jury may have declined to recommend the death penalty in a particular case but whether generally juries in this jurisdiction impose the death sentence for conduct similar to that of the defendant." Stamper v. Commonwealth, 220 Va. 260, 283-84, 257 S.E.2d 808, 824 (1979), cert. denied, 445 U.S. 972 (1980). Additionally, the question of proportionality does not turn on whether a given capital murder case "equal[s] in horror the worst possible scenario yet encountered." Turner v. Commonwealth, 234 Va. 543, 556, 364 S.E.2d 483, 490, cert. denied, 486 U.S. 1017 (1988).

"The purpose of our comparative review is to reach a reasoned judgment regarding what cases justify the imposition of the death penalty." Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000). Although we cannot insure that "complete symmetry" exists among all death penalty cases, "our review does enable us to identify and invalidate a death sentence that is 'excessive or disproportionate to the penalty imposed in similar cases.' " Id. (quoting Code § 17.1-313(C)(2)); see also Akers, 260 Va. at

14

365, 535 S.E.2d at 677. The purpose of performing a comparative review is not to search for proof that a defendant's death sentence is perfectly symmetrical with others, but to identify and invalidate a death sentence that is aberrant. Orbe, 258 Va. at 405, 519 S.E.2d at 817.

Emmett's assertion that a raw statistical analysis of the most recent capital murder cases reviewed by this Court involving the gradation offense of robbery compels the conclusion that a sentence of death would be inappropriate in his case represents an overly simplistic and unwarranted application of the proportionality review process. We do include consideration of the predicate gradation offense or status of the defendant or victim that elevates a murder to a capital crime in narrowing our focus to determine proportionality. However, we also take into account other factors including, but not limited to, the method of killing, the motive for the crime, the relationship between the defendant and the victim, whether there was premeditation, and the aggravating factors found by the sentencing body. In doing so, we fulfill the statutory mandate to consider "both the crime and the defendant." By merely considering the most recent capital murder cases appealed to this Court where the gradation offense was robbery, Emmett has not based his argument on a probative

15

selection of prior cases, but on an incidental ratio that has little or no bearing on the crime or the defendant in this case.

Having conducted the appropriate proportionality review, we find that other sentencing bodies generally impose the death penalty for comparable or similar crimes.  See, e.g., Akers, 260 Va. 358, 535 S.E.2d 674; Graham v. Commonwealth, 250 Va. 79, 459 S.E.2d 97 (1995), cert. denied, 516 U.S. 997 (1996); Watkins v. Commonwealth, 238 Va. 341, 385 S.E.2d 50 (1989), cert. denied, 494 U.S. 1074 (1990); Stout v. Commonwealth, 237 Va. 126, 376 S.E.2d 288, cert. denied, 492 U.S. 925 (1989); Watkins v. Commonwealth, 229 Va. 469, 331 S.E.2d 422 (1985), cert. denied, 475 U.S. 1099 (1986); Poyner v. Commonwealth, 229 Va. 401, 329 S.E.2d 815, cert. denied, 474 U.S. 865 (1985).  Accordingly, we hold that the sentence of death imposed in this case was not disproportionate.

CONCLUSION

Having reviewed the sentence of death pursuant to Code § 17.1-313, we decline to commute that sentence.  Accordingly, we will affirm the judgment of the trial court.[2]

---

[2] The United States Supreme Court in Atkins v. Virginia, ___ U.S. ___, ___ 122 S.Ct. 2242, 2252 (2002), recently held that the execution of mentally retarded persons violates the Eighth Amendment's prohibition against cruel and unusual punishments. The Court did not establish an express standard for determining when an individual would be considered mentally retarded and left to the States the task of developing appropriate ways to

16

---

enforce this constitutional restriction upon executions. Atkins, ___ U.S. at ___, 122 S.Ct. at 2250. The General Assembly has not had the opportunity to address this matter following the decision in Atkins.

At trial, Emmett did not assert that he is mentally retarded. Moreover, our review of the record reveals nothing that even suggests that he is mentally retarded. Emmett received a high school equivalency diploma, attended a community college, and was regularly employed during his adult life prior to committing the murder in question. Accordingly, we conclude that Emmett does not suffer from any mental retardation that would constitutionally restrict the imposition of the death sentence in this case.