Thomas Wayne AKERS, by appointed counsel, Robert LEE, as next friend, Petitioner,

v.

Ron ANGELONE, Director, Virginia Department of Corrections, Respondent.

No. CIV. A.7:01–CV–00141.

United States District Court, W.D. Virginia. Roanoke Division.

March 1, 2001.

Robert Edward Lee, Jr., Marie Frances Donnelly, Charlottesville, VA, for Petitioner.

Robert Q. Harris, Office of Attorney General, Richmond, VA, for Respondent.

## MEMORANDUM OPINION

WILSON, Chief Judge.

Thomas W. Akers is scheduled to die tonight for murdering Wesley B. Smith. By all accounts, including his own, the murder was extraordinarily vile and cruel, and by all accounts Akers is poised to kill again if the opportunity arises.[1] At every stage since his apprehension, Akers has plainly and clearly expressed his desire to die rather than spend the rest of his life in prison. He has steadfastly rejected legal assistance to spare his life. Contrary to Akers' directives, Robert Lee, Akers' appointed state habeas counsel, filed a motion in this court yesterday pursuant to 28 U.S.C. § 2251 and 28 U.S.C. § 1651 to stay the execution and has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the lawfulness of Akers' death sentence. Essentially, Lee argues that Akers was incompetent at the time he pled guilty and remains incompetent to this day. It follows, Lee contends, that he has standing as a "next friend." After thoroughly reviewing the record, the court denies the motion and dismisses Lee's petition, because he lacks standing.

### I.

On December 19, 1998, the body of Wesley Smith was found in Franklin County. He had been robbed, strangled, and beaten to death. On December 22, 1998, Ak-

---

1. See Appendix, Exhibits 1–2.

ers was arrested and charged with the capital murder and robbery of Smith. Thomas Blaylock and David Furrow were appointed to represent Akers. On August 25, 1999, in front of Judge William N. Alexander, II, in Franklin County Circuit Court, Akers pled guilty to the charges.[2]

Defense counsel first informed the judge of Akers' wish not to present any mitigating evidence at the sentencing in a hearing on September 28, 1999. A sentencing hearing was conducted on November 5, 1999, in which defense counsel, at the behest of Akers, presented no argument and no mitigating evidence. Judge Alexander then sentenced Akers to death based on the aggravating factors of future dangerousness and vileness.

On December 10, 1999, Akers signed a form indicating that he did not want to appeal his conviction and sentence. Akers also filed a notice with the Supreme Court of Virginia on January 12, 2000, indicating that he did not want to participate in his appeal whatsoever. The Supreme Court of Virginia then remanded to the circuit court the question of whether Akers' waiver was knowing, intelligent, and voluntary. On March 16, 2000, Judge Alexander conducted the hearing and, on April 4, 2000, entered an order finding that Akers was competent to waive his right to participate in a direct review of his conviction and sentence. After reviewing the sentence, the Supreme Court of Virginia affirmed it on September 15, 2000. Akers did not seek a rehearing or petition the United States Supreme Court for certiorari.

On October 6, 2000, Robert Lee was appointed to represent Akers in his state habeas proceeding. Based on a letter from Akers, the Commonwealth requested that Judge Alexander set an execution

date after explaining that Akers had no intention of filing a state habeas petition. On January 26, 2000, Judge Alexander set Akers' execution date for March 1, 2001. Lee filed a petition for habeas corpus relief on behalf of Akers in the Supreme Court of Virginia on February 12, 2001. Lee requested an evidentiary hearing to determine Akers' competence to waive further litigation. The Supreme Court of Virginia dismissed the petition on February 27, 2000, without conducting a hearing. On February 28, 2001, in this court, Lee filed a motion for stay of execution and a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## II.

Even if he supported Lee's "next friend" petition, Akers could not prevail on the competency claims that Lee raises. In a federal habeas proceeding, the court is rarely the trier of facts if those facts have been expressly or even implicitly found by the state trial court. Instead, the state court's factual determinations are presumed to be correct, and the petitioner only can overcome that presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

"The presumption of correctness accorded to state court findings 'only applies to basic, primary facts, and not to mixed questions of law and fact.'" *Combs v. Coyle,* 205 F.3d 269, 277 (6th Cir.2000). The presumption also applies to the state court's implicit factual findings. *See Combs,* 205 F.3d at 277; *see also Campbell v. Vaughn,* 209 F.3d 280, 285–86 (3d Cir. 2000); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir.1997); *Sprosty v. Buchler,* 79 F.3d 635, 643 (7th Cir.1996); *Ventura v.*

---

**2.** For a complete recitation of the facts, see *Akers v. Commonwealth,* 260 Va. 358, 535

S.E.2d 674 (Va.2000).

*Meachum,* 957 F.2d 1048, 1055 (2d Cir. 1992); *Tinsley v. Borg,* 895 F.2d 520, 524 (9th Cir.1990); *Crespo v. Armontrout,* 818 F.2d 684, 686 (8th Cir.1987). While "the proper characterization of a question as one of fact or law is sometimes slippery," *Thompson v. Keohane,* 516 U.S. 99, 110–11, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), "the competency determination should be treated as a question of fact for purposes of § 2254(d)," *Mackey v. Dutton,* 217 F.3d 399, 412 (6th Cir.2000). *See also Maggio v. Fulford* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam). As the Supreme Court observed in *Thompson:*

> In several cases, the Court has classified as "factual issues" within § 2254(d)'s compass questions extending beyond the determination of "what happened." This category notably includes: competency to stand trial; and juror impartiality. While these issues encompass more than "basic, primary, or historical facts," their resolution depends heavily on the trial court's appraisal of witness credibility and demeanor. This court has reasoned that a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer "presumptive weight."

*Thompson,* 516 U.S. at 111, 116 S.Ct. 457 (citations omitted).

The presumptive weight accorded an explicit or implicit competency determination is not dependent upon formalism. The failure to conduct a competency hearing is not tantamount to a failure to find competency. The opinion in *Mackey v. Dutton* is instructive. In that case, the state trial court found insufficient evidence that the defendant, Mackey, was incompetent and refused to order a psychiatric examination or hold a formal competency hearing. On

federal habeas, the district court declined to conduct an evidentiary hearing on the issue of Mackey's competency despite Mackey's argument that the material facts were not adequately developed at the state court hearing. In affirming the district court, the Court of Appeals for the Sixth Circuit reasoned:

> Mackey's arguments were implicitly rejected by the [Supreme] Court in *Fulford.* In *Fulford,* the state trial court received evidence on the defendant's motion for a psychiatric evaluation, but it refused to order a further inquiry into the defendant's competency. Despite the fact that no evidentiary hearing on competency had been conducted by the trial court, the Supreme Court accorded the trial court's competency determination a presumption of correctness.

*Mackey,* 217 F.3d at 413 n. 14 (citing *Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983)).

Lee argues that "no federal court ever has presumed correct findings from a state court with regard to competency where there has not been an evidentiary hearing in the state court." (Petitioner's Reply to Opposition to Stay of Execution, p. 2). Even if Lee's historical perspective of the law were correct, Lee's view of the record before this court is stilted. Judge Alexander, the Virginia Circuit Judge that heard Akers' plea of guilty and sentenced him to death, made findings of fact based on the evidence before him on three separate occasions: when he took Akers' plea, at Akers' sentencing, and when Akers attempted to waive direct appeal to the Supreme Court of Virginia.[3]

A review of the record clearly discloses that Judge Alexander patiently and carefully questioned Akers to insure

---

**3.** The issue that faced Judge Alexander is the same facing this court: whether Akers is competent to decide not to take further legal action.

that Akers was pleading guilty knowingly, intelligently, and voluntarily with a full understanding of the consequences of his plea. He also questioned counsel about results of a psychological examination in order to establish, in his words, "absolutely, unequivocally that there [was] no impediment as far as Mr. Akers making the decision that he [made]." (Sup.Ct. of Va., J.A., vol. 1, p. 24). Counsel then informed the judge of the results of a psychological examination that concluded that Akers was capable of making an informed decision about his plea. The judge, nevertheless, directed counsel to file a report from the doctor who evaluated Akers, and the judge further explained to Akers that he had to have something from the doctor stating that there was "absolutely no impediment" to Akers pleading guilty. (Sup.Ct. of Virginia, J.A., vol. 1, p. 23). The judge then accepted Akers' plea, finding that Akers had knowingly, intelligently, and voluntarily pled guilty "understanding the consequences." Several days later, Akers' counsel forwarded to Judge Alexander a letter from the licensed clinical psychologist who evaluated Akers, Dr. Evans S. Nelson. Dr. Nelson noted that he had written counsel a letter "in great detail as early as June 14, 1999, stating [his] opinion that Mr. Akers was competent to plead guilty," despite Akers' insistence that the court sentence him to death rather than to life imprisonment. (Sup.Ct.Va., J.A., vol.1, p. 198–99). He explained that

> Mr. Akers possessed the capacity to rationally understand, appreciate, and consider the consequences of his plea of guilty. Most people would disagree with Mr. Akers' judgment in doing so, but good judgment and competency are far from synonymous... This defendant has real-life experience with what it means to be a prisoner and knows he did not

cope well; ... he can clearly articulate reasons for his guilt on the capital murder charge and had a command of the evidence in his case; he could articulate why a viable defense is not possible as the evidence stands now; and, of course, he intentionally engineered the scuttling of his defense prospects through letters and leaks. Furthermore, there were no indications that Mr. Akers was psychotic, severely depressed (beyond the normal situational stress associated with a pending capital murder trial), or suicidal (he did not want to kill himself by his own hand; his plea of guilty is for other reasons), nor were there signs of a neuropsychological injury that impaired his capacity to make a reasoned choice.

(*Id.*) Dr. Nelson concluded that "from the mental health perspective [he saw] no viable reason to question [Akers'] competency to [make decisions]." (*Id.* at 199).

Against this factual backdrop, Judge Alexander carefully considered Akers' decision not to introduce mitigating evidence at sentencing, found Akers' decision to have been knowing, voluntary, and intelligent, and sentenced Akers to death.

Judge Alexander had a third, and final, opportunity to consider, at least implicitly, Akers' competency when Akers attempted to thwart the mandatory appeal of his death sentence to the Supreme Court of Virginia, and Judge Alexander conducted a hearing March 16, 2000, to determine whether Akers was acting voluntarily and intelligently. Once again, he considered all of the evidence that he had received or heard before, as well as Akers' answers to questions, his demeanor, his manner of expression, and his articulate correspondence, and he once again found that Akers acted "voluntarily and intelligently." (Sup. Ct.Va., J.A., vol.1, p. 240–41).

Judge Alexander's findings are not mere formalisms. They are entitled to deference for a reason. Judge Alexander was in the best position to determine whether Akers understood the proceedings and whether he was capable of assisting his counsel if he wished. Judge Alexander clearly concluded on three separate occasions after careful deliberation that Akers was fully competent, and there is no credible suggestion that Akers' mental condition has changed. In fact, on state habeas review, the Supreme Court of Virginia concluded that "the petition and accompanying affidavits are not sufficient to allege a basis for requiring a plenary hearing to determine whether Thomas Wayne Akers is mentally competent to make his own decision to file a writ of habeas corpus." *Akers v. Warden of Sussex I State Prison,* No. 010338 (Va. Feb. 27, 2001).

"One necessary condition for 'next friend' standing in federal court is a showing by the proposed 'next friend' that the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability." *Whitmore v. Arkansas,* 495 U.S. 149, 165, 110 S.Ct. 1717, 109 L.Ed.2d

135 (1990). Lee has offered the opinions of a psychiatrist and a neuropsychologist who have never examined Akers and who provide no credible evidence that Akers' mental condition has changed.[4] Under the circumstances, Lee has failed to satisfy the threshold requirement of standing.

### III.

For the reasons stated above, the court denies Lee's motion to stay Akers' execution and dismisses his petition. The court will issue an appropriate order this day.

### FINAL ORDER

In accordance with the Memorandum Opinion entered this day, it is hereby **ORDERED AND ADJUDGED** that:

1. the Motion for Stay of Execution, filed on behalf of Thomas Wayne Akers, is **DENIED**; and

2. the petition under 28 U.S.C. § 2254 for writ of habeas corpus, filed on behalf of Thomas Wayne Akers, is **DISMISSED**.

It is further **ORDERED** that this action be stricken from the active docket of the court.

---

**4.** Akers has refused to submit to further psychological evaluation.

EXHIBIT 1

#1

MR. HAPGOOD,  APRIL 27, 1999.

I HAVE NO SYMPHATHY OR REMORSE FOR BEATING WESLEY SMITH TO DEATH. IN FACT IT GAVE ME AN INTENSE ERREOTION. WHEN I LOOK AT YOU AND THE JUDGE IN THE COURTROOM I ENVISION TAKING BOTH OF YOU AGAINE YOUR WILL AND TAKING BOTH OF YOU TO A REMOTE AREA IN FRANKLIN AND CAUSE YOU TWO TO DIE OF A SAVAGE BEATING JUST LIKE WESLEY SMITH GOT. I'M MY OWN "GOD" I TAKE LIVES AT WILL AND I BELIEVE AND FOLLOW MYSEL DEATH IS ALL FUN AND GAMES TO ME AND MY "FOLLOWERS." I OUT SMARTED THE PEOPLE OF THE COMMONWEALTI AFTER 11 LONG YEARS BEHIN. BARS! I LEFT A BODIE IN VIRGINIA'S FIELD JUST TO SHOW THEM 190 HOW BLIND MY

#2

ONE DAY AND COME BACK AND EXECUTE JUSTICE ONCE AGAIN. I LIKE TO BEAT ALL MY VICTIMS AND WALK TO AND FRO IN THEIR BLOOD. MY "CRIME SEEN" SHOWS I DIDN'T "CONCEAL" NOTHING AND I EVEN LEFT MY BOOTS IN THE TRUNK OF THE CAR ALL BLOOD COVERED FOR THE COMMONWEAITH I EVEN WENT TO SMITH'S HOUSE AFTER THE KiLLiNG AND HAD A DECENT MEAL AND CHANGED iNTO HIS CLOTHES AND TOOK A PLEASURABLE TRIP TO NEW YORK AND LAUGHING TO THE COMMONWEAITH OF VIRGINIA ON MY WAY. BY THE WAY I CHALLENGE YOU AND ANY FRANKLIN COUNTY JUDGE TO A COURTROOM DUAL BY A "STRAIGHT TRIAL" I DON'T EVEN WANT A JURY TRIAL! I WAIVE MY RIGHT TO A JURY HERE AND NOW"! SIGNED AND DATED THIS DAY OF

\# 3

APRIL 27, 1999. I DON'T BELIEVE THE COMMONWEALTH OR JUDGES HAVE THE HEART TO SENTENCE ME TO DEATH. AND IF I DO GET LIFE WITHOUT PAROL I PROMISE VIRGINIA I Will PLOT AND SCHEME BEHIND BARS AND ESCAPE AND COME BACK TO FRANKLIN COUNTY AND EXECUTE JUSTICE TO SOME SPECIAL PEOPLE I HAVE IN MIND! DON'T PROCRASTINATE LET'S GET THE Killing ON THE WAY!

I THOMAS WAYNE AKERS WAIVE A TRIAL BY JURY AND REQUEST A STRAIGHT TRIAL BY JUDGE! SIGNED DATED THIS DAY OF APRIL 27, 1999.

I'VE MASTERED 33 1/3 DEGREES IN 11 YEARS. I POSSESS 360 DEGREES OF PURE RAWL POWER!

192

THOMAS AKERS

## EXHIBIT 2                             72

to Smith's house after the killing and had a decent
meal and changed into his clothes and took a pleasur-
able trip to New York and laughing to the Common-
wealth of Virginia on my way.

"By the way, I challenge you and any Franklin
County Judge to a Courtroom dual by a straight trial.
I don't even want a Jury trial. I waive my right to
a Jury here and now. Signed and dated this day of
April 27, 1999. I don't believe the Commonwealth or
the Judges have the heart to sentence me to death,
and if I do get life without parole, I promise Vir-
ginia I will plot and scheme behind bars and escape
and come back to Franklin County and execute justice
to some special people I have in mind. Don't pro-
crastinate. Let's get the killing on the way.

"I, Thomas Wayne Akers, waive a trial by Jury
and request a straight trial by Judge. Signed, dated
this day of April 27, 1999. I have mastered 33 and
a-third degrees in eleven years. I possess 360
degrees of pure, raw power. Thomas Akers."

I have received some other correspondence, but
the ones that are relevant, the next one and the last
one that I intend to read would be dated
June 18, 1999.

"Clifford Hapgood, June 18, 1999, I have this

last finishing touch for you to build your case on. After I killed Wesley Smith I flipped his body face down and took his wallet out of his back pocket. I took $180 to $200 out of the wallet. I saw the driver's license and the credit cards, but my true mission was his Christmas bonus from John Hancock Steel in Salem, Virginia, but he paid his car payment off in full before I got the chance to kill and rob him of his full Christmas bonus, but I spent the $180 to $200 with pure happiness on drugs, food, liquor and gas on my way to Canada. I had no use for the wallet or the driver's license after I robbed him for the money. It was my full intent to kill and rob Wesley Smith after I got acquainted with him. If Mr. Martin truly wanted to kill Mr. Smith, why would he have done it years ago," excuse me, "why wouldn't he have done it years ago.

"It was my mission. I have never had no qualms about nothing I do or have done. I am my own God. I do and live by my own thoughts, ways, and actions. I came out of prison to deliver death, pain, and destruction. When a man gains proper knowledge, wisdom, understanding, and learns he is God, nothing or nobody can stop him. Make sure September 13, 1999 you've got all your I's dotted and

your T's crossed. You've got all the ammunition you need for me. Don't allow your aim to be off, because if I am allowed the privilege to kill again, I promise my aim will be true and cocked towards the Commonwealth of Virginia's seal. No respect. "Vinca, vinni, viccia", Thomas Akers, June 18, 1999."

I think that the summary of the evidence by Officer Jamison and Officer Woods summarizes every single thing that Mr. Akers wrote me in both of those letters. That is information that Mr. Akers had that only the killer would have, that these were not widely known details, especially as to the monetary transactions that he discusses about Mr. Smith's Christmas bonus and the things like that.

He clearly knows and substantiates what we already found, and that was that Wesley Smith was taken by Mr. Martin and Mr. Akers, and he was taken to a remote spot in Franklin County where Mr. Akers and Mr. Martin savagely beat, choked, kicked, dragged him down the hill, and then did it again, and drove off in his car.

They had the audacity to go to his house, steal his goods, eat his food, load his clothes, put his clothes on, take those, even run a load through the washing machine, and then go to New